on behalf of Petitioner Mr. Dunn. I would like to reserve two minutes of my time for a rebuttal argument, if I might. Well, that was enough time on the clock. First, I'd like to address the Batson issue that was raised in this case. Essentially, Miller L2 really controlled the issue with respect to the comparative juror analysis that was not conducted in this case by the Court of Appeal except for a partial comparative juror analysis. Miller L2 has held that the prosecutor has to state the reasons and stand or fall on those reasons when it is the point in time when they are called upon to justify their challenges to particular jurors. Here, the prosecutor said that it has to do with close family members that have been convicted, not of any particular crime, but just convicted. A comparative analysis of all of the seated jurors against those black jurors who were excluded shows that there was a disparity between what the prosecutors said the reasons were and what the actual striking of the jurors were in the particular case. Miller L2 spoke for the need of comparative juror analysis to get at the third-prong issue, and in saying it, it was more powerful than the bare statistics that were provided in Miller L2. It was the, quote, side-by-side comparisons of black jurors struck and white panelists allowed to serve on the jury that they must control. One of the issues that's raised in the Respondent's Brief and one of the issues that's raised in the supplemental authorities that were submitted by the Respondent was that in the Attorney General's first amicus brief to the Miller L court, the AG said that there was a trial court comparative analysis. In the subsequent amicus brief, which was filed in September 2004, the AG conceded that the trial court did not conduct a comparative juror analysis, and the Texas Attorney General in Miller L2 also conceded that no CJA or no comparative juror analysis was done until the Federal court. The State court opinion is wrong for several reasons. First, it was a ---- The State court of appeal did do a comparative analysis, didn't it? The State court of appeal did an attempted comparative juror analysis. What they did was they compared ---- I'm sorry. When you say attempted, you're not happy with the way they did it. No, it was not complete. They only utilized the jurors who were in the panel at the time of the strike rather than comparing the whole panel, as Miller L suggests or Miller L says, of the juror jury that was seated. So in doing the comparison, the court of appeal only compared two jurors of the five that were the white jurors who had the same characteristics. Jurors Pankow, Cohen, and Neal, I believe it was, Vega, were not utilized by the court of appeal when they conducted their analysis. And their analysis only came about in a, in a, quote, in any event situation. They first said that the court of appeal could not perform a comparative juror analysis based upon California law. And Miller L now says that this approach is wrong. The State court also said that in the attempted comparative juror analysis on appeal was difficult because it didn't allow for the prosecutor to make its full record. Whereas, in this case, the prosecutor did make a record as to what it was that he was doing when he struck jurors. He was ---- What's the ideology of this claim in the original trial? Excuse me? Where is the ---- What's the ideology of this claim in the original trial? Well, in the trial ---- What was made, what objection was made in the trial court that's in the record here on this habeas case? There were two separate bats and challenges that were made by the trial counsel in the case. Is this, all this analysis was made before the trial court? There was no comparative juror analysis made in the trial court. And was there any objection to the failure to make that analysis? No. So is that not defaulted under California law? No, it's not. As we set up ---- California law? As we set out in our reply brief that handles the procedural aspects that the State has made, the situation is, is that in trial ---- the trial court is not required, nor is the defense counsel required to ask for comparative analysis at trial. Miller L. makes that very clear, I think, when it talks about the fact it is just but one of the tools that the appellate courts, because in Miller L. there was no trial court comparative juror analysis. So you could just set the trial judge up and sit there and be quiet and forget it, right, until you get around to habeas corpus in the Ninth Circuit? No, not at all. The requirement of trial counsel is to object when the prosecutor strikes persons of color or other persons who are of a similar class or characteristics. That's the objection that has to be made. All right. So the trial court says no. I mean, then that's all there is in the record. You've preserved your error? It's not unlike what Miller L. Exactly what Miller L. did when they reached this opinion. You've preserved it in the Miller L. for purposes of appeal. You do have to make the argument that some employees, some put time in the State courts for exhaustion purposes. The objection was made as to Batson and the trial court. When we raised the issue in appeal in the State court of appeal, we raised the comparative analysis as a way in which to look at the phenomena that occurred, which is exactly what Miller L. did. When the Miller L. Court, the Supreme Court, got the case, they looked at all of the record. They also looked at the shuffling of jurors and other factors, but they looked at all of the evidence. Did you make this comparison? Was the argument made in the court of appeal, did that include all of the jurors? Yes. Including the ones that the court of appeal did not consider? In our argument, yes. Not only in our opening brief and our reply brief, but by me in oral argument to the court of appeal, where I asked them to do a comparative juror analysis, and the argument essentially was about the fact that California did not and was not required to do so. Miller L. One, actually, I think, is giving plenty of groundwork for allowing for that to occur, and Miller L. Two, I think, is very clear about the fact that that's exactly what the Supreme Court did when it looked at the situation. It's not like a separate claim of comparative analysis. It is just a way in which to measure whether or not the third prong was satisfied. It's other evidence. The Supreme Court says that you can use a wide range of evidence when it is that you're looking at a Batson challenge. That would include comparative analysis. In a recent case from Pennsylvania out of the Third Circuit, they looked at the training materials that a prosecutor had used and had given as part of his teaching to other prosecutors as a basis to show that the third prong of Batson was failed in that particular case. I mean, Miller L. clearly does say that. It is a little strange, though, because it does look like he's setting up the trial judge in that you make a Batson objection, and there's all this evidence, which is in the courtroom, available to everybody there, available to the trial judge and defense lawyer and the prosecutor. So they could do the analysis there at the trial court level. And normally, the rule we have is that you have to give the trial judge first crack at it an issue. But the Supreme Court says I guess not, so. I understand that. And I think the difference is, is this is just a way of measuring what occurred or looking at what happened to make the determination. It's not a claim in and of itself. Okay. I don't want to argue with you because you're right that the Supreme Court said you don't have to make the argument at trial court, but we know that if we do make it at trial court and you persuade the judge, then you avoid the problem. That's correct. But in this case, it didn't happen. We urged it at the court of appeal. The court of appeal refused. Then they did, like I say, an in any event analysis, but they limited their analysis to only those jurors that were seated at the not, not seated at the time, not all the jurors that served in the case. So they didn't compare all of the five seated jurors who had the exact same characteristics as the black jurors that were excused. So they never did that analysis. The other thing that they did in reaching it is, is that they essentially gave the prosecutors hypothetical reasons for why it was he might have struck some of the other jurors. And Miller L. Is also very clear on that, that the prosecutor, the reasons that the prosecutor gives at the time when they are asked, and in this case, it's family members with drug abuse, family members with convictions. Those are the reasons that they must stand or fall on. It's not for another court to come in and to say, well, they could have asked or they could have excused this particular juror for this reason. So in that sense, in short, the CJA, the comparative justice analysis conducted by the State court was improper, and it was erroneous by clear and convincing evidence because the five seated jurors had the same precise characteristics that the prosecutor said he was relying on to strike the African-American jurors under Miller L. And the facts presented here, Mr. Dunn is entitled to relief. Briefly, if I might, just with respect to competency, we put on all of the evidence that we had, and it was all evidence that was not defense oriented. We put on the Social Security Administration records. We put on the Stanford Medical Group diagnosis of Mr. Dunn. We put in the Sacramento County Jail medical records. We put in the California Department of Corrections records that occurred after his conviction which placed him in and still has him placed in a mental health population. He was taking 75 milligrams more of Sinoquan than is the maximum daily dosage throughout the course of his trial. What's the impact of that drug on someone's mental state? Well, what it has is it has side effects that can and cannot, you know, apply to someone such as drowsiness, but the one side effect that's consistent throughout the drug is it causes confusion and some sort of problem in thinking. So making decisions. We do have his testimony which sounds lucid. Yes. And we have the testimony of his lawyer who said he sounded fine. I doubted him. He was always on point. Yes. So, you know, what you have is expert testimony of these possible side effects and then the experience of somebody who actually dealt with him plus transcripts that we can look at that seems to indicate that he had none of these side effects. You know better. In odal, the determination that the trial counsel is not the person to make a determination about someone's competency is the controlling issue. In the transcripts, trial counsel says that he has a reputation for making competency objections all the time. That's not the measure. The measure is whether or not someone has the capability of understanding. But it has to be some triggering event. In odal, he committed a highly bizarre crime. Yes. And then sat down and waited for the police. I mean, totally, totally, I mean, kind of no motive, no rhyme or reason. Plus there were other indications in odal that he was, that he had mental problems. Here you have nothing at all contemplating. No, that's not true. What we have is, is that trial counsel admitted that he spoke to Mr. Dunn prior to trial. Mr. Dunn told him that he was on social security disability, that he was suffering from major mental disorders, that he in fact had been given psychoactive drugs while he was pending trial, and that they were having an effect upon him. Mr. Dunn's counsel at that point in time had a duty to at least call the jail and ask the medical staff, what drugs is he taking, what effects do these drugs have on him, and then either to ask them or to do independent research in the physician's desk reference to find out what the effects of this drug are, and to then perhaps hire someone such as Dr. Edwards, who we had as an independent doctor, wasn't by the defense or the prosecution. He was the jail psychiatrist in the Sacramento County Jail post the time that Mr. Dunn was there, who evaluated, who tested him, who spent two days interviewing him, and took all of the material together and made a determination that he was incompetent and not able to rationally assist counsel, not just because of the drugs, not just because of his ability or inability to answer questions, but because of the totality of all of the circumstances. Many years later. Several years later, yes. But the records, the Social Security records, the Stanford Medical Group records, and the Sacramento County Jail records are all prior to the trial. And the CDC records occur after the trial. And what's most telling is, is that when jail staff, some, I think it was ten days or so, after the trial decided that he needed to be taken off this medication because it, quote, made him out of it. So we have given everything and all neutral. We didn't hire a defense doctor to come in and give the testimony. We used all independent records that had occurred prior to the trial. What the jail staff medication was giving him, not what he was getting from the streets, not what he was getting from his own doctor, but what the jail staff was giving him, and then subsequent reaffirmation by the California Department of Corrections that he, in fact, is mentally ill. All of those facts were provided. You can still be mentally ill and understand what's going on at the trial level. Absolutely. Okay, so mentally ill is not going to do it for you. I want testimony from Dr. Edwards that he is totally incompetent to understand what's going on or what business is being transacted in court. I don't find that. For example. Dr. Edwards says that Mr. Dunn was impaired to such an extent that he wouldn't be able to cooperate with his attorney in the preparation of his defense. Now, was there anything, though, during the trial that Mr. Dunn did which was suspicious? I hear what you're saying. He was heavily induced with these drugs. He had all these medical records. But during the trial, did he do anything suspicious? Was he falling asleep? Was he acting up? Was he talking to himself? Well, I don't think Senequan is going to necessarily make you talk to yourself over a period of time. The question is what you can't see. You can't see what's going on in his mind, and that is, as he said to counsel. No, but medical science can give you a clear diagnosis. That's what Dr. Edwards did. But he looked at all of the records. What was Dr. Edwards' medical diagnosis? Not what effect did it have. Medical diagnosis, was this guy schizophrenic? No, that he suffered from a major mental disorder of depression that was long-term and long-going, that he had a physical incapacity of degenerative. What mental effect? Pardon? What mental effect? How was his mentality impaired? Because of his long-standing mental disorder of depression, his mental outlook on everything is impaired to some extent because of that. That's irrational, right? Well, I'm not saying it's totally irrational, but the mind is affected by this drug. I mean, when you know that the Sacramento County Jail, 10 days later after the trial, pulls him off of it because they know that it makes him out of it. They adjusted his medication up on one and down on the other. I understand that. No, I'm talking about post-trial. No, post-trial. But the day of trial, the day after trial, they kicked it up to 225 milligrams, which may be fine for functioning within the jail, but it doesn't allow for someone to be functioning in a courtroom when they have the other disabilities that they have going on with it, to add to it the fact that they have a medication, a psychoactive drug, that they're receiving 75 milligrams above the recommended dosage. It's like 150 is the maximum. He's getting 225. So it's like a full third above what the maximum is. Now, we were able to, by our testimony, I believe, prove under Cooper, by a preponderance of the evidence, that he was, in fact, incompetent. We have a doctor, independent doctor, who testified to this, and we have the records both before and afterward all pointing to the fact that Mr. Dunn was indeed incompetent at the time of the trial and unable to rationally assist. Because he spoke, because he testified, and it may follow a pattern, doesn't take into account that it's the decision to testify that has to be evaluated. And whether he was capable of doing that is what Dr. Edwards is saying. The totality of these circumstances make it such that he believed that it was not fair for him or that it was improper for him to be able to classify as competent to assist because of all of these problems. Okay. Thank you. Good morning. George M. Hendrickson, Deputy Attorney General for the appellee in this case. Since Miller L. 2 was cited late, I haven't been able to read it. However, Miller L. 1 described the comparative analysis that was done. Miller L. was cited for some time. That's true, and I apologize. It's a bad case. It's been around. It's gone up and down. Miller L. 1 described the comparative analysis was done, described the defense argument on remand in the state court in rebuttal to the prosecutor's explanation. When was it cited here? When was it cited in this court? Yeah. I received the letter this morning. I didn't know that there was a Miller L. 2 until this morning, and I apologize for that. We have a library. I'm sorry? We have a library. That's true. I have a library as well. Let's see. I did not understand counsel to say that Miller L. 2 specifically discussed the propriety of comparative analysis in the face of a specific state procedural bar as we've consistently raised in this case, and if it did. You're wrong, aren't you? I could be, but I didn't hear counsel say that. It helps to read the recent Supreme Court cases when they're called to your attention. True. So why don't you go ahead. I wish to assert the bar of Teague v. Lane that this is a new rule that may not be applied to previous cases. How was it applied to Miller L. in Miller L.? I don't know that the Teague v. Lane argument was raised or discussed. I think you should skip this. That's fine. However, I would like to point out. Did you raise Teague v. Lane in your brief? I don't believe. Maybe you waived it. We have a discussion in Justice Kaczynski's opinion in Burks v. Borg, I believe. Have you been talking to the President? I'm sorry? You know something I don't know? I'm sorry. Didn't you write? Judge Kaczynski. Burks v. Borg? Judge. Judge. He hasn't got a promotion yet. I'm sorry. I'm going back. That's why he couldn't read Miller L. You were talking to the White House. You know something I don't know. You're using the state terminology, I apologize. We're not state judges here. That's true, and we've emphasized that. I expect you to read the cases before you come into court. Yes, sir. In Williams I. I'm sorry? In the ADPA case of Williams I, stresses that the law to be applied is the federal law that's in existence at the time of the state court decision. The state court decision in this case was in 1994. You know, if you're going to spend your time trying to argue that we should ignore Miller L., you're really foolish. You might as well just sit down and not waste our time or yours opposing counsel. If that's really your approach, you just read Miller L. Sounds like it. If you think that we're going to do to ourselves or inflict on ourselves a wound that the Fifth Circuit inflicted upon itself with that case, you are being highly optimistic. Yes, sir. Why don't you go ahead and start addressing the merits of the two claims presented. If you don't have anything on the merits, sit down and we'll just order the case submitted. I have the merits. I would like to point out. Let's get to the six minutes and five and a half minutes into your argument. Let's get to the merits. All right. First point on the merits. The state court of appeal did a complete comparative analysis based on all of the jurors, contrary to what counsel has said. There were, I believe, four jurors, four black jurors that the prosecutor excused that were the basis of the two Batson motions. One had an uncle convicted of murder. That was the last one. One had fired a gun apparently in the air on the Fourth of July. We think that those two are obviously valid and speak for themselves. The dispute apparently is over two other jurors, Rover and Godbold. The district attorney, as he explained, his approach to the challenges was based on the connection with drugs, which would suggest that the jurors themselves had a shared attitude with the drug-using relatives  And that was true of Rover and Godbold, as the prosecutor explained and as the court of appeal pointed out. These inferences, as the court of appeal said, were negated with respect to Sims, Vega, Pankow, and Cohen, and had no connection at all with Perry, whose brother was connected with Grand Theft Auto. The analysis is not complete because it doesn't include people who were in the bar, but were excluded. It only looks at seated jurors. I'm missing something. The Batson-Wheeler challenge was based on four black jurors who were excused on prosecutorial peremptory challenges. Were the white jurors who were excused? Yes, actually, the court of appeal did. The opinion, starting at page 22 of the opinion, compared jurors Wollum, Riddleberger, Navarez. Actually, they characterized them as non-black. Which page are you reading from? The opinion, I believe it's starting at page 22, where they discussed these other four jurors. They pointed out that Wollum had a relative convicted of manslaughter, that Riddleberger had a relative who used drugs, Navarez also, and Cechi also. And in comparison to the jurors who were not excused but who were seated, the court of appeal pointed out that, as to Sims, the juror was not chummy with the drug-using relative and, therefore, set herself apart from this relative and was unlikely to have sympathy with the relative or drug user and, therefore, would not be likely to have an anti-prosecution bias. As to Vega, the court of appeal pointed out that the cousin who used methamphetamine was not in good standing. That's the opinion at page 20 and 21. And, also, Vega had a relative who was a murder victim and, therefore, would be likely to have at least some sympathy with the prosecution case. Pankow had a daughter who was a druggie. She's a drug user and a longtime drug user. The mother was obviously very concerned about her daughter, very supportive, was concerned about getting her daughter off drugs. And those circumstances hardly show an approval of the drug-using lifestyle but actually an antipathy to it, seeing the damage it caused to her daughter. And on that basis, there was no reason why the prosecutor would think that Juror Pankow would have an anti-prosecution bias. Cohen was black herself. She did have a brother who was a drug user. But, similarly, the court could conclude or, rather, the court of appeal noted that at least there's a basis for the conclusion that there's no anti-prosecution bias there. As counsel just pointed out, Pankow and Cohen were questioned. Those are the comparison jurors, Pankow and Cohen. They were questioned after the second Batson motion. And, therefore, the trial court had no possible opportunity to review their answers. And on that basis, we would actually suggest that the claim is not exhausted. You haven't read Miller-El. I've read the first Miller-El. Yeah, but you haven't read the second Miller-El where they deal exactly with this issue and they say no. All right. I will leave it for the... What time this morning did you get the notice? When I was in here. I've got mine on the bench. It's a big case of Norman Batson. I don't think that any lawyer's worth of salt wasn't aware of Miller-El had to do with the Batson issue. It's been kicking around for years. It was quite surprising when the Supreme Court took it up for the second time. I was surprised that it took it up so quickly. That's probably what surprised me. Do you have anything to say on the competency issue? Yes. Is that a second? May I? I'm sorry. Go ahead. On the conclusion of the Batson issue, the Court of Appeal properly evaluated all the comparative... Do you have anything on the competency issue? Yes. Excuse me, Your Honor. Okay. The district... Rather, I believe the state court and the district court properly denied, properly found that the defendant was not incompetent to stand trial based on the jail records, the defendant's own testimony, and his attorney's testimony. As we've shown by the evidence at the hearing and the physician's desk reference, an overdose would be evidenced by drowsiness, and there simply was none. The defendant's initial problem was his anxiety, and that is why he said that he basically couldn't go forward with the trial because he was too anxious, and that is why the jail doctors gave him Sinequan to reduce his anxiety. The jail records show that they monitored the dosage of Sinequan to reduce his anxiety without making him out of it, as he later reported after the trial. And that was, I believe, 10 or 20 days after the trial that that happened. The expert witness relied on by the defense was a psychologist, not a psychiatrist, therefore not a medical doctor. He testified that he was not an expert on drug dosage, and we certainly didn't vouch for his ultimate opinion in agreeing that he could examine the defendant. In addition to the fact that his opinion was speculative, being based on an examination about 10 years after the fact, it was also hedged, as the magistrate and the district court found, in that it was more likely than not the defendant was incompetent, and as the magistrate and the district court found, that failed to rise to the level of clear and convincing evidence. Are there any questions? Okay. Just one second. One second. All right. First, we told the attorney general on Wednesday of this week that we would be relying on Millerell. We just handed the copy today of the letter, but we had told him this week. You mean you called Mr. Lockett? Pardon? You called? I'm sorry. What state is this? The attorney general, you said. Yes. Opposing counsel. We called opposing counsel on Wednesday and told him that we would be submitting something that included Millerell. We just gave him the actual letter with the additional authorities this morning, but we told him on Wednesday. Is that a fact? He said they were deciding on Millerell. They didn't say they were deciding on Millerell. With respect, I have nothing further. You were not aware that there was a subsequent Millerell? What? I believe I said that when I was arguing. That sounds to be right. I was not aware that there was a subsequent Millerell. You read Millerell the first time? You thought it was over? Boy, you know, this was private practice. When you see Mr. Locke here, just tell him of this incident for me, would you? I'm sure he'll be interested. He and I are good buddies. He and I are good friends. Just mention to him this incident. I was not too happy about it. Thank you.
judges: Beezer, Kozinski, Carney